## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES and the COMMONWEALTH of MASSACHUSETTS *ex rel.* KEVIN MURPHY,<br><br>Plaintiffs,<br><br>v.<br><br>SIGNATURE HEALTHCARE CORPORATION, SIGNATURE HEALTHCARE MEDICAL GROUP, INC., BETH ISRAEL DEACONESS MEDICAL CENTER, INC., and HARVARD MEDICAL FACULTY PHYSICIANS at BETH ISRAEL DEACONESS MEDICAL CENTER, INC.,<br><br>Defendants. | Civil Action No.<br><br>FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2) |

### FALSE CLAIMS ACT COMPLAINT

## I.     PRELIMINARY STATEMENT

1.     Since at least as early as 2012, defendant Signature Healthcare Corporation ("SHC"), a non-profit corporation that operates a Safety Net hospital in Brockton, Massachusetts, and SHC's subsidiary, defendant Signature Healthcare Medical Group, Inc. ("SMG") (collectively, "the Signature Defendants"), have engaged in a fraudulent scheme to overpay physicians in order to induce them to refer Medicare and Medicaid patients to SHC's hospital and associated medical entities.

2.     The Stark Law, 42 U.S.C. § 1395nn, prohibits hospitals and other providers from, among other things, paying inflated, above-fair-market compensation to physicians who refer certain designated healthcare services to those providers. Congress intended this prohibition to

ensure that physicians make medical decisions for their patients based on medical judgment and not the physicians' own financial interests.

3.      In direct violation of the Stark Law, the Signature Defendants redesigned their physician compensation methodology in or about 2011 with the explicit goal of paying extraordinary compensation to high-referring family practice and internal medicine physicians to ensure that they would refer all or nearly all of their patients to providers affiliated with the Signature Defendants. Similarly, the Signature Defendants, either directly or indirectly, paid extraordinary administrative compensation to certain physicians who performed high-value procedures at the Signature Defendants' facilities, but the Signature Defendants never required the recipients of this administrative compensation to document any work they did in exchange for it.

4.      The effect of these payment arrangements has been to provide excessive compensation to certain SMG physicians at the expense of the larger institution, which has had to subsidize the compensation with money, including Safety Net funds, that SHC could have used to improve patient quality of care in the low-income community that it serves.

5.      By 2016, according to the Signature Defendants' own analysis, they were paying at least a dozen key high-referring family practice and internal medicine physicians compensation that substantially exceeded fair market value.

6.      In the years since, the Signature Defendants have received repeated warnings that their compensation of many SMG physicians was excessive and improper, yet the Signature Defendants have done nothing to reduce that compensation to fair market value.

7.      Separately, since in or about 2014, the Signature Defendants and defendants Beth Israel Deaconess Medical Center, Inc. ("BIDMC"), and Harvard Medical Faculty Physicians at

Beth Israel Deaconess Medical Center, Inc. ("HMFP"), have engaged in a kickback scheme, in violation of the anti-kickback statute ("AKS"), 42 U.S.C. § 1320a-7b(b), whereby BIDMC, directly and indirectly, provides various forms of remuneration to the Signature Defendants in exchange for referrals to BIDMC and HMFP of complex cases requiring tertiary hospital care.

8.     As a result of their knowing violations of the Stark Law, the Signature Defendants submitted, or caused the submission of, thousands of false claims to Medicare and MassHealth in violation of the federal False Claims Act, 31 U.S.C. §§ 3729-33, and the Massachusetts False Claims Act, Mass. Gen. Laws c. 12, §§ 5A-5O. Likewise, as a result of their kickback scheme, the Signature Defendants, BIDMC, and HMFP submitted, or caused the submission of, thousands of false claims to Medicare and MassHealth.

9.     Accordingly, Kevin Murphy ("Relator") brings this action as a *qui tam* relator on behalf of the United States and the Commonwealth of Massachusetts against the defendants pursuant to the *qui tam* provisions of the federal and Massachusetts False Claims Acts to recover damages, penalties, attorneys' fees and costs, and other relief.

## II.    JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732, which confers jurisdiction over actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

11.     This Court has original and supplemental jurisdiction over the state law claims pursuant to 31 U.S.C. § 3732(b) and 28 U.S.C. § 1367 because this action is brought under state law for the recovery of funds paid by the Commonwealth of Massachusetts, and because it arises from the same transactions or occurrences as the claims Relator brings on behalf of the United States under 31 U.S.C. § 3730.

12.     This Court may exercise personal jurisdiction over each of the defendants, and venue is appropriate in this Court, under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b), because each of the defendants can be found and transacts business in this District.

## III.    THE PARTIES

### A.    Relator

13.     Since October 2019, Relator has served as Senior Vice President and Chief Financial Officer of SHC, and as Treasurer of SMG. Relator lives in Massachusetts.

14.     Prior to the filing of this Complaint, Relator made substantive disclosures to the government of facts and evidence underlying the allegations in this Complaint, in accordance with the requirements of the False Claims Act, 31 U.S.C. § 3730(b)(2), and the Massachusetts False Claims Act, Mass. Gen. Laws c. 12, § 5C(3). Relator is an original source of the allegations in this Complaint.

### B.    Signature Healthcare Corporation

15.     SHC is a Massachusetts non-profit corporation with a principal place of business at 680 Centre Street, Brockton, Massachusetts. SHC operates Brockton Hospital and several outpatient healthcare facilities in the Brockton area. According to the SHC website, Brockton Hospital is a 216-bed teaching hospital that was founded in 1896 and "is the oldest and largest inpatient facility in its service area, which is designated as the city of Brockton and twenty-one surrounding municipalities." Brockton Hospital is a Medicare and MassHealth provider.

16.     SHC derives a substantial portion of its revenues from Federal health care programs, including Medicare and MassHealth. Each year, Brockton Hospital also receives millions of dollars from the Massachusetts Health Safety Net Trust Fund in exchange for providing care to low-income, uninsured, and underinsured residents regardless of their ability to

pay. *See* Mass. Gen. Laws c. 118E, §§ 64-69; 101 Code Mass. Regs. 613.00 - 614.00. For the years 2014-2020, the Safety Net payments to Brockton Hospital have been as follows:

| Year | Safety Net Payment to Brockton Hospital |
|------|------------------------------------------|
| 2014 | $16,000,000 |
| 2015 | $16,699,000 |
| 2016 | $16,726,000 |
| 2017 | $16,458,000 |
| 2018 | $16,049,000 |
| 2019 | $13,076,000 |
| 2020 | $15,362,000 |

### C.    Signature Healthcare Medical Group, Inc.

17.    SHC owns SMG, which is a Massachusetts corporation with a principal place of business at 680 Centre Street, Brockton, Massachusetts. SMG employs approximately 100 physicians, physician assistants, and nurse practitioners who work at Brockton Hospital and other SHC healthcare facilities. Approximately 40 percent of SMG physicians are primary care physicians.

18.    Each year, SHC has allocated approximately 40 percent of its Safety Net payments to SMG, but SMG still consistently loses millions of dollars per year – on average, over $10 million annually from 2014 to 2020 – in large part because its expenditures on physician compensation and associated overhead greatly exceed its revenues from the physicians' own billings.

### D.    Beth Israel Deaconess Medical Center, Inc.

19.    BIDMC, which is now a part of Beth Israel Lahey Health, is a Massachusetts corporation with a principal place of business at 330 Brookline Avenue, Boston, Massachusetts. Among other things, BIDMC operates Beth Israel Deaconess Medical Center, a Harvard Medical School Teaching Hospital. BIDMC is the sole corporate member of Medical Care of Boston

Management Corporation a/k/a Affiliated Physicians Group ("APG"), a physician practice group.

### E. Harvard Medical Faculty Physicians at Beth Israel Deaconess Medical Center, Inc.

20.    HMFP is a Massachusetts corporation with a principal place of business at 375 Longwood Avenue, Boston, Massachusetts. HMFP employs physicians and operates a faculty practice plan organization at BIDMC.

## IV.    LEGAL BACKGROUND

### A.    The False Claims Act

21.    The False Claims Act provides, in pertinent part, that any person who:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

\*\*\*

is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount of damages which the Government sustains because of the act of that person.

31 U.S.C. § 3729(a)(1).

22.    For purposes of the False Claims Act, "the terms 'knowing' and 'knowingly' mean that a person, with respect to information[,] (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

23.    The False Claims Act defines the term "claim," in pertinent part, as

any request or demand, whether under a contract or otherwise, for money or
property and whether or not the United States has title to the money or property,
that (i) is presented to an officer, employee, or agent of the United States; or (ii) is
made to a contractor, grantee, or other recipient, if the money or property is to be
spent or used on the Government's behalf or to advance a Government program
or interest, and if the United States Government--(I) provides or has provided any
portion of the money or property requested or demanded; or (II) will reimburse
such contractor, grantee, or other recipient for any portion of the money or
property which is requested or demanded[.]

31 U.S.C. § 3729(b)(2).

24.     The Massachusetts False Claims Act has analogous provisions. *See* Mass. Gen.

Laws c. 12, §§ 5A-5B.

**B.     The Stark Law**

25.     Enacted as amendments to the Social Security Act, the physician self-referral law,

commonly referred to as the "Stark Law," prohibits hospitals and other entities providing

"designated health services" ("DHS"), as defined in 42 U.S.C. § 1395nn(h)(6) and 42 C.F.R.

§ 411.351, from submitting to Medicare claims for DHS as a result of patient referrals from a

physician who has a "financial relationship" (as defined in the statute and regulations) with the

hospital that does not satisfy the requirements of an applicable exception, and prohibits payment

for such claims. The Stark Law also applies to Medicaid claims. *See* 42 U.S.C. § 1396b(s).

26.     Congress enacted the Stark Law to address overutilization of services, increased

costs, and medical decision-making by physicians who stood to profit from referring patients to

facilities or entities in which the physicians had a financial interest. *See, e.g.*, Health Care

Financing Administration, *Medicare Program; Physician Ownership of, and Referrals to, Health*

*Care Entities that Furnish Clinical Laboratory Services*, 57 Fed. Reg. 8588, 8589 (Mar. 11,

1992).

7

27.    In a 1994 Special Fraud Alert, the Department of Health and Human Services

Office of the Inspector General ("HHS-OIG") explained the risk of improper financial

relationships between physicians and hospitals to which the physicians refer patients:

> Why Is it Illegal for Hospitals to Provide Financial Incentives to Physicians for
> Their Referrals?
>
> …
>
> These incentive programs can interfere with the physician's judgment of what is
> the most appropriate care for a patient. They can inflate costs to the Medicare
> program by causing physicians to overuse inappropriately the services of a
> particular hospital. The incentives may result in the delivery of inappropriate care
> to Medicare beneficiaries and Medicaid recipients by inducing the physician to
> refer patients to the hospital providing financial incentives rather than to another
> hospital (or non-acute care facility) offering the best or most appropriate care for
> that patient.

HHS-OIG, *Special Fraud Alert: Hospital Incentives to Physicians*, 59 Fed. Reg. 65375 (Dec. 19,

1994).

28.    The Stark Law initially applied to referrals of Medicare patients for clinical

laboratory services made by a physician to a laboratory with which the physician had a financial

relationship unless a statutory or regulatory exception applied. *See* Omnibus Budget

Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the Stark Law's

application to referrals for additional DHS, including inpatient and outpatient hospital services,

and radiology and laboratory services. *See* 42 U.S.C. § 1395nn(h)(6); Omnibus Reconciliation

Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432,

§ 152.

29.    The Stark Law provides that, unless an exception applies, if a physician "has a

financial relationship with an entity . . . then (A) the physician may not make a referral to the

entity for the furnishing of designated health services for which payment otherwise may be made

. . ., and (B) the entity may not present or cause to be presented a claim . . . or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A)." 42 U.S.C. § 1395nn(a)(1).

30.    "Financial relationships" include "compensation arrangements" involving the payment of remuneration directly or indirectly to a referring physician, as defined in 42 U.S.C. § 1395nn(h)(1) and 42 C.F.R. § 411.354.

31.    The Stark Law and its companion regulations set forth exceptions for certain financial relationships, including "bona fide employment relationships" and "indirect compensation arrangements." These exceptions operate as affirmative defenses to alleged violations of the statute, but a defendant must prove compliance with every requirement of the exception.

32.    To qualify for the *bona fide* employment relationships exception, a compensation arrangement must meet all of the following requirements:

(A) the employment is for identifiable services;

(B) the amount of the remuneration under the employment—

(i) is consistent with the fair market value of the services; and

(ii) is not determined in a manner that takes into account – directly or indirectly – the volume or value of any referrals by the referring physician;

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer; and

(D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2); *see also* 42 C.F.R. §§ 411.357(c), 411.354(d)(4).

33.    To qualify for the indirect compensation arrangements exception, an indirect compensation arrangement must, among other things, meet the following requirement:

> The compensation received by the referring physician (or immediate family member) described in § 411.354(c)(2)(ii) is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS.

42 C.F.R. § 411.357(p)(1)(i).

34.     A physician employed by a hospital may be paid a "productivity bonus," but only if, and to the extent that, the bonus is based solely on the value of the services "performed personally by the physician," *i.e.*, not on the volume or value of the physician's referrals. 42 C.F.R. § 411.357(c)(4).

35.     Medicare and Medicaid may not pay claims from a hospital for DHS referred by a physician who has a financial relationship with the hospital unless a Stark Law exception applies. 42 U.S.C. § 1395nn(g)(1); 42 U.S.C. § 1396b(s).

36.     The Stark Law regulations expressly require that any entity collecting payment for DHS "performed pursuant to a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d).

37.     In 2005, HHS-OIG provided hospitals and physicians with further compliance guidance concerning their financial relationships:

> The general rule of thumb is that any remuneration flowing between hospitals and physicians should be at fair market value for actual and necessary items furnished or services rendered based upon an arm's-length transaction and should not take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties.

> Arrangements under which hospitals . . . inflate compensation paid to physicians for items or services pose significant risk. In such circumstances, an inference arises that the remuneration may be in exchange for generating business.

> In particular, hospitals should review their physician compensation arrangements and carefully assess the risk of fraud and abuse using the following factors, among others:

• Does the compensation represent fair market value in an arm's-length transaction for the items and services? Could the hospital obtain the services from a non-referral source at a cheaper rate or under more favorable terms? Does the remuneration take into account, directly or indirectly, the value or volume of any past or future referrals or other business generated between the parties? Is the compensation tied, directly or indirectly, to Federal health care program reimbursement?

. . . .

• Is the compensation commensurate with the fair market value of a physician with the skill level and experience reasonably necessary to perform the contracted services?

• Were the physicians selected to participate in the arrangement in whole or in part because of their past or anticipated referrals?

• Is the arrangement properly and fully documented in writing? Are the physicians documenting the services they provide? Is the hospital monitoring the services?

HHS-OIG, *Supplemental Compliance Program Guidance for Hospitals*, 70 Fed. Reg. 4858,

4866-67 (Jan. 31, 2005).

### C.   The Anti-Kickback Statute

38.   The AKS makes it illegal either to:

(1). . . knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
(B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. . .
[or]

(2). . . knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program. . . .

42 U.S.C. § 1320a-7b(b). Thus, the AKS prohibits, among other things, monetary inducements to "refer an individual to a person for the furnishing . . . of any item or service" reimbursed by a Federal health care program.

39.      "[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the False Claims Act]." 42 U.S.C. § 1320a-7b(g).

40.      "[A] person need not have actual knowledge of [the AKS] or specific intent to commit a violation of [the AKS]." 42 U.S.C. § 1320a-7b(h).

**D.      The Medicare Program**

41.      In 1965, Congress enacted Title XVIII of the Social Security Act, known as the Medicare program, to pay for the costs of certain healthcare services. The United States Department of Health and Human Services ("HHS") is responsible for administering and supervising the Medicare program, which it does through the Centers for Medicare and Medicaid Services ("CMS"), an agency of HHS.

42.      Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

43.      The Medicare regulations define a "provider" to include "a hospital . . . that has in effect an agreement to participate in Medicare." 42 C.F.R. § 400.202.

44.      Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

45.      There are four parts to the Medicare Program: Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health

care (*see* 42 U.S.C. §§ 1395c-1395i-4); Part B primarily covers outpatient care, including

physician services and ancillary services (*see* 42 U.S.C. § 1395k); Part C is the Medicare

Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through

private health insurers (*see* 42 U.S.C. § 1395w-21, *et seq.*); and Part D provides prescription drug

coverage (*see* 42 U.S.C. § 1395w-101, *et seq.*; 42 C.F.R. § 423.1, *et seq.*).

46.    For at least the past 10 years, CMS has contracted with Medicare Administrative

Contractors ("MACs") to assist in the administration of Medicare Parts A and B. *See* CMS,

*Medicare Program; Hospital Outpatient Prospective Payment System and CY 2007 Payment*

*Rates; CY 2007 Update to the Ambulatory Surgical Center Covered Procedures List; Medicare*

*Administrative Contractors; and Reporting Hospital Quality Data for FY 2008 Inpatient*

*Prospective Payment System Annual Payment Update Program—HCAHPS Survey, SCIP, and*

*Mortality*, 71 Fed. Reg. 67960, 68181 (Nov. 24, 2006). MACs generally act as CMS's agents in

reviewing and paying Part A and Part B claims submitted by healthcare providers and perform

administrative functions on a regional level. *See* 42 C.F.R. § 421.5(b); *see also* 42 U.S.C.

§§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

47.    Under the Medicare program, CMS (through MACs) makes payments for hospital

inpatient and outpatient services on a per-claim basis, and through the year-end cost-report

reconciliation process described below.

48.    Upon discharge of Medicare beneficiaries from a hospital, the hospital submits

Medicare Part A claims for reimbursement for inpatient and outpatient services delivered to

those beneficiaries. 42 C.F.R. §§ 413.1, 413.60, 413.64.

49.    When physicians provide patient care services in a hospital setting, whether to

hospital inpatients or outpatients, they (or an entity to which they have assigned billing rights)

may bill Medicare for their "professional" services, which include performing procedures and interpreting test results, using a CMS Form 1500. The hospital may submit a separate claim to Medicare for the "technical" or "facility" component of the services rendered in order to obtain reimbursement for furnishing, among other things, equipment and non-physician staff.

50.     Providers must be enrolled in Medicare in order to be reimbursed by the Medicare program. *See* 42 C.F.R. § 424.505. To enroll in Medicare, institutional providers such as hospitals periodically must complete a Medicare Enrollment Application (often called a Form CMS-855A). In completing the Medicare Enrollment Application, an institutional provider certifies: "I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. *I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law)*, and on the provider's compliance with all applicable conditions of participation in Medicare." (Emphasis added.)

51.     The Medicare Enrollment Application also summarizes the False Claims Act in a separate section that explains the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program."

52.     Medicare enrollment regulations further require providers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

53.     As a prerequisite to Medicare payment under Medicare Part A, CMS also requires hospitals to submit annually a Form CMS-2552, commonly known as a hospital cost report. A

cost report is the final claim that a provider submits to a MAC for items and services rendered to Medicare beneficiaries during the year covered by the report.

54.     After the end of a hospital's fiscal year, the hospital files its hospital cost report with the MAC, stating the amount of Part A reimbursement the hospital believes it is due for the year, or the amount of excess reimbursement it has received during the year through interim payments that is owed back to Medicare. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20; *see also* 42 C.F.R. § 405.1801(b)(1). Medicare relies on the hospital cost report to determine whether the hospital is entitled to more reimbursement than already received or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

55.     Medicare Part A reimbursement for hospital services, *see* 42 U.S.C. § 1395ww, is based on a prospective payment system (Diagnosis Related Groups or "DRGs") using the claims submitted by the hospital for patient discharges (listed on Form CMS-1450) during the course of the fiscal year. On the hospital cost report, the payments for services are added to any other Medicare Part A add-on payments due to the provider. This total determines Medicare's liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the interim payments made to the provider based on claims it submitted during the year are subtracted to determine the amount due to or due from the provider.

56.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

57.     That chief administrator or designee is required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of

health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

58.    The hospital cost report certification page also includes the following notice:

Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified by this report were provided or procured through the payment directly or indirectly of a kickback or were otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

42 C.F.R. § 413.24(f)(4)(iv)(B).

59.    Thus, a provider must certify (1) that the filed hospital cost report is truthful, *i.e.*, that the cost information contained in the report is true and accurate; (2) that it is correct, *i.e.*, that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) that it is complete, *i.e.*, that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations, including the Stark Law and the AKS.

60.    A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its MAC.

61.    Medicare, through its MACs, has the right to audit a provider hospital's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. *See* 42 C.F.R. § 413.64(f).

**E.    The Medicaid Program**

62.    Medicaid (known as MassHealth in Massachusetts) is a joint federal-state program that provides health care benefits for certain groups, primarily the poor and disabled.

The federal portion of each state's Medicaid payments, known as the Federal Medical Assistance Percentage, is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). In Massachusetts, the federal contribution is 50 percent.

63.    Hospitals that participate in MassHealth must enter into a provider contract. In every MassHealth provider contract, the provider agrees, among other things, "to comply with all laws, rules, and regulations governing MassHealth." 130 C.M.R. § 450.223(C)(1).

**F.    Medicare Rules for Billing Evaluation and Management Services**

64.    The American Medical Association publishes an annual manual of Current Procedural Terminology ("CPT") codes. The CPT Manual is a listing of descriptive terms and identifying codes for reporting the nature and complexity of medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services. In 2000, to implement the Health Insurance Portability and Accountability Act of 1996, the Department of Health and Human Services designated the CPT code set as a national coding standard for physicians and other health care professional services and procedures. *See* 45 C.F.R. § 162.1002(a)(5). As a result, for all physician services billed to Federal health care programs, CPT codes must be used in describing health care services rendered.

65.    Standard office visits performed by physicians and other providers are generally billed using Evaluation and Management ("E&M") CPT codes. There are different sets of codes depending on the type of patient and type of service, *e.g.*, for new patients, established patients, hospital inpatient visits, consultations, and the like.

17

66.    In general, E&M codes of a certain type have different levels (generally indicated by the last digit of the five-digit code) indicating increasing levels of intensity of the services provided.

67.    The code used must reflect only services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). As CMS has explained:

> Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code. It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted. The volume of documentation should not be the primary influence upon which a specific level of service is billed.

CMS, *Medicare Claims Processing Manual*, c. 12, § 30.6.1(A).

## V.    FACTUAL ALLEGATIONS

### A.    The Signature Defendants' Excessive Compensation of Family Practice and Internal Medicine Physicians

68.    Beginning in 2011, the Signature Defendants engaged in a deliberate strategy to pay excessive compensation to certain family practice and internal medicine physicians whom they identified as generating a high volume of lucrative referrals to Brockton Hospital and other SHC providers.

69.    The Signature Defendants' own consultants found this compensation to be substantially above fair market value ("FMV").

70.    Despite knowing the compensation was above FMV, the Signature Defendants did not reduce the compensation to bring it into compliance with FMV standards. Instead, over time, they paid those physicians even more.

      1.     *SMG Redesigned Its Physician Compensation Structure in 2011 with the Specific Intent to Reward High-Referring Physicians.*

71.     The Signature Defendants' payment of illegal compensation to SMG physicians began after the Signature Defendants redesigned SMG's physician compensation plan in 2011. In a July 2011 memorandum summarizing the new plan, the Signature Defendants explicitly noted that the intent of the compensation redesign was to keep certain high-referring physicians employed by SMG.

72.     A key premise of the Signature Defendants' plan was that, as long as the physicians were employed by SMG, they would continue to refer all or nearly all of their patients to Brockton Hospital and other SHC providers. Meanwhile, the Signature Defendants predicted that, if these physicians left SMG's employ, then SHC would lose 50% of all revenue associated with the physicians' Medicaid patients and 80% of all revenue associated with their non-Medicaid patients. Further, as the Signature Defendants memorialized in their memorandum, the Signature Defendants feared that, if the physicians left SMG, the subsequent "loss of patients would affect the volumes of downstream specialty physicians."

73.     Similarly, in developing the new plan, the Signature Defendants recognized that "OPD [outpatient department] physicians were considered strategic due to the importance of the . . . facility payments of the OPD."

74.     Accordingly, the Signature Defendants settled on a plan comparable to a "net revenue model with ancillaries [*i.e.*, revenue from referrals] credited to the physicians." Specifically, the Signature Defendants agreed to incorporate into their compensation model an "ancillary credit of $150,000 per physician" on top of the value of the services the physicians themselves provided.

75.     To be clear, the Signature Defendants' subsequent contracts with SMG's family practice and internal medicine physicians did not explicitly increase compensation based on the number of ancillary referrals. Instead, the Signature Defendants incorporated this "ancillary credit" into the compensation structure (described in greater detail below) through inflated payments per physician work unit for family practice and internal medicine physicians.

2.     *The Signature Defendants' Compensation Structure*

76.     The Signature Defendants based their 2011 compensation plan on a "productivity compensation" system that generally paid physicians a base salary, or "draw," up front, and then additional compensation (or, possibly, a clawback of some of that up front payment) based on the amount of work the physician did during the year.

77.     The Signature Defendants used a unit of measurement for physician work called a "work Relative Value Unit," or "wRVU." wRVUs represent the relative amount of physician work, resources, and expertise necessary to provide a service to a patient, and serve as a productivity metric for work performed by physicians. Each CPT code has a wRVU value, and thus the total amount of physician work done in a time period can be calculated in a standardized way by tallying all of the wRVUs associated with all of the clinical procedures and services associated with the CPT codes billed by a physician.

78.     To calculate the amount paid for a given service or procedure, insurers and other payers typically multiply the wRVUs associated with a procedure by a "conversion factor." A conversion factor is a dollar amount associated with the value of a procedure worth one wRVU. Thus, if the conversion factor is $50 per wRVU, then the compensation for a procedure worth 0.5 wRVUs is $25.

79.      Under the 2011 plan, the Signature Defendants agreed to a base payment methodology that gave physicians a higher conversion factor if they hit certain thresholds for the volume of wRVUs they performed. Thus, physicians who generated a high volume of wRVUs would make more money per wRVU for all of the work they did that year – not just more money per wRVU for the amount they did above those given thresholds.

80.      The Signature Defendants' plan assigned higher conversion factors for physicians in certain specialties, such as family practice and internal medicine, that generated more referrals for SHC and its providers.

81.      Initially, as the July 2011 memorandum contemplated, the Signature Defendants planned to pay family practice and internal medicine physicians $62 per wRVU if they achieved at least 8,100 wRVUs. For example, the Signature Defendants incorporated their plan in the following table from an October 2011 contract with SMG family practice physician Syed Imam:

Conversion Factor Chart

| wRVU Tiers | wRVU Production | | Conversion Factor | Conversion Factor Increase by Tier |
|---|---|---|---|---|
| | At Least | And Less Than | | |
| Tier 1 | - | 2,700 | $40.00 | 91% |
| Tier 2 | 2,700 | 3,300 | $41.00 | 94% |
| Tier 3 | 3,300 | 3,900 | $43.00 | 97% |
| Tier 4 | 3,900 | 4,500 | $44.00 | 100% |
| Tier 5 | 4,500 | 5,100 | $46.00 | 103% |
| Tier 6 | 5,100 | 5,700 | $48.00 | 106% |
| Tier 7 | 5,700 | 6,300 | $50.00 | 109% |
| Tier 8 | 6,300 | 6,900 | $52.00 | 112% |
| Tier 9 | 6,900 | 7,500 | $54.00 | 115% |
| Tier 10 | 7,500 | 8,100 | $56.00 | 118% |
| Tier 11 | 8,100 | | $62.00 | 121% |

82.      Notably, though, by the next year, SMG had modified the family practice and internal medicine payment tiers (and amended the physician contracts) with a substantial

increase in the conversion factor for the top productivity tiers (starting at Tier 7). Under the new

system, the conversion factor for the previously highest tier (Tier 11) jumped from $62 per

wRVU to $75 per wRVU. In addition, the Signature Defendants created a new Tier 12 that paid

$83 per wRVU, as shown in the following table from a September 2012 contract with Dr. Imam:

**wRVU Tiers**

| | wRVU Production | | |
|---|---|---|---|
| | At Least | And Less Than | Conversion Factor |
| Tier 1 | - | 2,700 | $40.00 |
| Tier 2 | 2,700 | 3,300 | $41.00 |
| Tier 3 | 3,300 | 3,900 | $43.00 |
| Tier 4 | 3,900 | 4,500 | $44.00 |
| Tier 5 | 4,500 | 5,100 | $46.00 |
| Tier 6 | 5,100 | 5,700 | $48.00 |
| Tier 7 | 5,700 | 6,300 | $53.00 |
| Tier 8 | 6,300 | 6,900 | $55.00 |
| Tier 9 | 6,900 | 7,500 | $57.00 |
| Tier 10 | 7,500 | 8,100 | $59.00 |
| Tier 11 | 8,100 | 10,000 | $75.00 |
| Tier 12 | 10,000 | | $83.00 |

As the Signature Defendants were subsequently warned, even the $48 conversion factor for the

middle tier, Tier 6, was 22 percent higher than the national median for family practice physicians

in the same wRVU range.

83.    Meanwhile, for physician specialties that had less potential to generate high-value

referrals for SHC, the Signature Defendants paid substantially less per wRVU. For example, in

comparison to adult patients of family practice and internal medicine physicians, patients of

pediatricians are less likely to be hospitalized or to need expensive procedures, such as magnetic

resonance imaging. The Signature Defendants paid pediatricians accordingly. Until 2018, the

Signature Defendants paid pediatricians a maximum of $45 per wRVU if they generated 8,500 or

more wRVUs. Beginning in 2018, the Signature Defendants increased that maximum to $52 per

wRVU, still well below what the Signature Defendants were paying family practice and internal

medicine physicians.

22

84. Similarly, in a 2016 contact, the Signature Defendants agreed to pay Sridhar Dasari, a pulmonologist, a maximum of $55 per wRVU if Dr. Dasari generated 9,000 or more wRVUs. And the Signature Defendants subsequently agreed to pay Kevin Charpentier, a surgeon, a maximum of $66 per wRVU if Dr. Charpentier generated 10,000 or more wRVUs.

85. The Signature Defendants' practice of rewarding family practice and internal medicine physicians with higher conversion factors if they achieved exceedingly high wRVUs had a double effect. First, it rewarded the physicians that the Signature Defendants knew were generating high levels of referrals. Second, the system incentivized those physicians to bill at an extraordinary pace.

86. The CPT manual allows for billing office visits based on factors such as the complexity of the patient's problem and intensity of the examination or based on the time spent on the date of the encounter, with specific time frames associated with each CPT code.

87. During the first five months of 2021, if the time-based methodology were used, the minimum time associated with the billings of multiple SMG physicians far exceeded the time they could have spent seeing patients. During that period, if a physician saw patients five days each week, had billable time of eight hours each day for those patient visits, and took no vacation time, the physician would have billed for 840 hours worth of services. In fact, during that same period, Dr. Imam billed CPT codes associated with a minimum of 1,796 hours, Dr. Ravindran Tharackal billed CPT codes associated with a minimum of 1,147 hours, Dr. Maulshree Gupta billed CPT codes associated with a minimum of 948 hours, Dr. Divjot Sooch billed CPT codes associated with a minimum of 947 hours, and Dr. Suresh Gundaji billed CPT codes associated with a minimum of 933 hours.

88.     Similarly, many of these physicians purported to treat extraordinary numbers of patients each day. During the last three months of 2021, for example, Dr. Imam reported seeing an average of 47.8 patients per day, and Dr. Gundaji reported seeing an average of 32.4 patients per day.

89.     Beginning in or about 2018, the Signature Defendants altered their plan slightly for all primary care (family practice, internal medicine, and pediatric) physicians, with 75 percent of each such physician's compensation dependent on the number of wRVUs the physician generated and 25 percent dependent on the number of patients in the physician's panel. Again, however, the Signature Defendants paid pediatricians less. In 2019, for example, the Signature Defendants applied the following "panel tiers" for family practice, internal medicine, and pediatric physicians:

| FP & IM Panel Tiers | | | | |
|---|---|---|---|---|
| 1 | 0 | 250 | $ | 115.00 |
| 1b | 250 | 500 | $ | 120.00 |
| 2 | 500 | 750 | $ | 125.00 |
| 2b | 750 | 1000 | $ | 130.00 |
| 3 | 1000 | 1250 | $ | 135.00 |
| 3b | 1250 | 1500 | $ | 140.00 |
| Median 4 | 1500 | 1750 | $ | 145.00 |
| 4b | 1750 | 2000 | $ | 150.00 |
| 5 | 2000 | 2250 | $ | 155.00 |
| 5b | 2250 | 2500 | $ | 160.00 |
| 6 | 2500 | 2750 | $ | 165.00 |
| 6b | 2750 | 3000 | $ | 170.00 |
| 7 | 3000 | 3250 | $ | 180.00 |
| 7b | 3250 | 3500 | $ | 185.00 |
| 8 | 3500 | 3750 | $ | 190.00 |
| 8b | 3750 | 4000 | $ | 195.00 |
| 9 | 4000 | 4250 | $ | 200.00 |
| 9b | 4250 | 4500 | $ | 205.00 |
| 10 | 4500 | 4750 | $ | 210.00 |
| 10b | 4750 | 5000 | $ | 220.00 |
| 11 | 5000 | 5250 | $ | 230.00 |
| 11b | 5250 | 5500 | $ | 240.00 |
| 12 | 5500 | | $ | 250.00 |

| Pedi Panel Tiers | | | | |
|---|---|---|---|---|
| 1 | 0 | 250 | $ | 110.00 |
| 1b | 250 | 500 | $ | 115.00 |
| 2 | 500 | 750 | $ | 120.00 |
| 2b | 750 | 1000 | $ | 125.00 |
| 3 | 1000 | 1250 | $ | 130.00 |
| 3b | 1250 | 1500 | $ | 135.00 |
| Median 4 | 1500 | 1750 | $ | 140.00 |
| 4b | 1750 | 2000 | $ | 145.00 |
| 5 | 2000 | 2250 | $ | 150.00 |
| 5b | 2250 | 2500 | $ | 155.00 |
| 6 | 2500 | 2750 | $ | 160.00 |
| 6b | 2750 | 3000 | $ | 165.00 |
| 7 | 3000 | 3250 | $ | 170.00 |
| 7b | 3250 | 3500 | $ | 175.00 |
| 8 | 3500 | 10000 | $ | 180.00 |

90.     While there can be variability by type of patient and other demographic factors, a general benchmark provides that a primary care physician carrying a full-time load cannot effectively manage a panel of more than 2,500 patients. *See, e.g.*, M. Raffoul, *et al.*, *A Primary Care Panel Size of 2500 Is neither Accurate nor Reasonable*, 29 Journal of the American Board of Family Medicine 496 (July-Aug. 2016).

91.     Nonetheless, incentivized by the Signature Defendants' compensation plan, certain SMG family practice and internal medicine physicians had patient panels of extraordinary size: in 2020, Dr. Imam purportedly maintained a panel of 5,198 patients, Dr. Paul Pettinato purportedly maintained a panel of 3,570 patients, Dr. Gundaji purportedly maintained a panel of 3,491 patients, Dr. Engel Bido purportedly maintained a panel of 3,482 patients, and Dr. Sooch purportedly maintained a panel of 3,137 patients.

92.     As a result of the Signature Defendants' compensation plan, the Signature Defendants began paying certain family practice and internal medicine physicians extraordinary

sums. In 2020, for example, the Signature Defendants paid Dr. Iman $1,327,186, based on his purported panel of 5,198 patients and his purportedly generating 16,518 wRVUs.

93.    Excessive compensation of physicians like Dr. Imam caused SMG consistently to lose money. In the specific case of Dr. Imam, for example, during the nine-month period through June 2021, Dr. Iman generated net patient service revenue of $947,276, but SMG paid him $1,082,606, resulting in a net loss of $140,915, not counting overhead associated with supporting Dr. Imam's practice. During the same nine-month period, when taking overhead into account, SMG's family practice, internal medicine, and pediatrics physicians generated an aggregate net loss of $7,671,792.

94.    During the years 2014-2020, SMG as a whole generated annual operating losses as follows:

| Year | SMG Operating Loss |
| --- | --- |
| 2014 | $6,048,639 |
| 2015 | $9,129,507 |
| 2016 | $12,620,867 |
| 2017 | $13,220,121 |
| 2018 | $8,467,143 |
| 2019 | $17,799,463 |
| 2020 | $10,240,419 |

But for SHC's allocation of approximately 40 percent of Brockton Hospital's Safety Net payments to SMG, SMG's annual operating losses would have been, on average, approximately $6 million higher during those years.

95.    Notwithstanding the consistent losses at SMG, SHC overall had positive operating results in all but two of the years from 2014 to 2020 because Brockton Hospital generally had positive operating margins that covered the losses at SMG. In other words, rather than investing the positive returns from Brockton Hospital, a Safety Net hospital, in ways that could have improved the quality of care for the hospital's predominantly low-income patients,

SHC instead has been draining resources from Brockton Hospital to pay high compensation to individual physicians.

**B.      The Signature Defendants' Knowledge of the Impropriety of Their Excessive Compensation of Family Practice and Internal Medicine Physicians**

96.      The Signature Defendants' senior executives were well aware of the requirements of the Stark Law, including the requirements that the compensation of employed physicians be fair market value and not determined in a manner that takes into account the value or volume of referrals. To that end, on repeated occasions, they commissioned analyses of their physician compensation practices. Those analyses consistently showed that the Signature Defendants' compensation of certain SMG family practice and internal medicine physicians far exceeded fair market value.

97.      In September 2014, WIPFLI, an accounting and consulting firm that had been advising Defendants on compensation issues since at least 2010, presented the Signature Defendants with an analysis comparing the compensation of SMG physicians with East Region benchmarks identified by the Medical Group Management Association ("MGMA"). WIPLI's analysis showed, among other things, that the Signature Defendants' compensation of several family practice physicians was well above the MGMA median, as depicted in the following slide:



98.    WIPFLI also cautioned that the Signature Defendants' compensation of family practice physicians at Tier 11 of the compensation plan ($75 per wRVU) was "91% higher than median."

99.    WIPFLI's September 2014 presentation to the Signature Defendants included the following summary slide:

Benchmark Analysis

Benchmark Analysis Summary

Based on the initial testing of the Signature physician compensation data in relation to external benchmarks, the following specialties include outlier arrangements that warrant further analysis and/or modification of the current approach in determining physician compensation:

- **Family Practice**
- **Internal Medicine**
- **Orthopedics**
- **Emergency Medicine**
- **Behavioral Health**

100.    Nonetheless, the Signature Defendants took no steps to alter their compensation practices in light of WIPFLI's findings.

101.    In or about 2017, the Signature Defendants engaged a valuation firm, Sullivan Cotter & Associates ("SullivanCotter"), to analyze the compensation that the Signature Defendants paid to their physicians in SHC's fiscal year 2016, the 12-month period from October 1, 2015, through September 30, 2016.

102.    On June 8, 2017, SullivanCotter presented a draft of its findings to the Signature Defendants. In that presentation, SullivanCotter warned that 12 SMG physicians fell outside SullivanCotter's quantitative fair market value guidelines.

103.    SullivanCotter performed a multi-step analysis to determine whether the Signature Defendants were paying fair market value to SMG physicians. First, for each physician, SullivanCotter compared the physician's total compensation (including benefits) to national market survey data it maintained for physicians in the same specialty group. So long as the physician's compensation fell at or below the 75th percentile of compensation for other

physicians in the same specialty group, SullivanCotter deemed the compensation within fair market value.

104.    SullivanCotter determined that the Signature Defendants were paying 26 physicians above the 75th percentile of compensation in the national market survey data and thus potentially above fair market value.

105.    For those 26 physicians, SullivanCotter proceeded to the second step of its analysis, which assessed whether the relatively high compensation of these physicians could be justified based on their productivity or the collections they generated from their work.

106.    The second step involved two separate comparisons: (1) a comparison of the clinical compensation per wRVU for that physician against national market survey data for physicians in the same specialty group; and (2) a comparison of the ratio of the physician's clinical compensation to his or her collections against national market survey data for physicians in the same specialty group.

107.    If the clinical compensation per wRVU fell below the 60th percentile of the national market survey data, or if the ratio of the physician's clinical compensation to his or her collections fell below the median of the national market survey data, SullivanCotter deemed the compensation within fair market value.

108.    Of the 26 SMG physicians who were receiving compensation that exceeded the 75th percentile of compensation in the national market survey data, SullivanCotter determined that 12 were both above the 60th percentile in terms of compensation per wRVU and above the median in terms of compensation to collections ratio.

109.    Thus, for those 12 physicians the Signature Defendants employed, SullivanCotter concluded that their total compensation "fell outside SullivanCotter's quantitative FMV

guidelines." These 12 physicians, all whom specialized in either family practice or internal medicine, were: Engel Bido, Olivera Boskovska, Michael Dern, Kerry Girard, Syed Imam, Paul Pettinato, Jeffrey Tannenbaum, Simret Tesfe, George Vardoulias, Craig Warnick, Robert Weinstein, and Jane Yu.

110.    On information and belief, after receiving SullivanCotter's findings in July 2017, the Signature Defendants took no action to reduce the compensation of these 12 physicians to levels that would be consistent with FMV.

111.    Shortly after Relator joined the Signature Defendants in October 2019, he became aware that the Signature Defendants were paying above-FMV compensation to many physicians. Over the next two years, Relator repeatedly conveyed to the Signature Defendants' senior executives and SHC's board his concerns about the Signature Defendants' physician compensation practices.

112.    For example, in monthly one-on-one meetings with Kim Hollon, who served as SHC's chief executive until November 2021, Relator regularly raised concerns, both from a financial and compliance perspective, about the outsized compensation packages for many SMG physicians.

113.    Beginning in November 2019, Relator also raised the same concerns in meetings with both Mr. Hollon and David Drinkwater, SMG's President. Among other things, Relator explained to them that the Signature Defendants were paying exorbitant compensation per wRVU at the highest wRVU tiers for family practice and internal medicine physicians. He also showed them that the Signature Defendants' compensation of certain physicians stood out in comparison to the compensation of physicians at other hospitals, as shown in those hospitals' Internal Revenue Service Forms 990.

114.    By and large, Mr. Hollon and Dr. Drinkwater brushed aside Relator's concerns about the Signature Defendants' compensation of SMG physicians. They told Relator that the information he provided on physician compensation was "interesting," but they took no action.

115.    In several meetings and telephone calls between late 2020 and June 2021, Relator also raised his concerns about physician compensation with Joseph Drier, the chair of SHC's board. Mr. Drier expressed to Relator that he appreciated Relator's concerns, but he took no action.

116.    Then, in a meeting on June 15, 2021, Mr. Hollon ordered Relator not to have further direct communication with Mr. Drier or any other SHC board members.

117.    Prior to that meeting, in November 2020, Mr. Hollon and Dr. Drinkwater directed that responsibility for day-to-day management of physician compensation – including calculation of amounts each physician had earned – would migrate from SHC's finance department to its human resources department. This migration, which ultimately proved unworkable, further served to prevent Relator and his direct reports from having access to information about the Signature Defendants' excessive compensation of certain physicians.

118.    In the meantime, in or about September 2020, the Signature Defendants again retained SullivanCotter to perform a fair market value assessment of the compensation Defendants were paying their physicians. This time, however, only four of the Signature Defendants' executives – Mr. Hollon, Dr. Drinkwater, Karen Murphy, SHC's General Counsel, and Brenda Brassard, SHC's Director of Human Resources – interacted with SullivanCotter. Defendants did not circulate SullivanCotter's findings to Relator, even though he is SHC's Chief Financial Officer.

119.    On information and belief, the Signature Defendants hid SullivanCotter's latest findings from Relator because they did not want to give Relator more basis for his concerns about the Signature Defendants' physician compensation practices.

120.    In an e-mail to Relator, Dr. Drinkwater, and Ms. Brassard on December 3, 2020, Mr. Hollon himself made a rare acknowledgment that the Signature Defendants' compensation practices remained problematic. In the e-mail, Mr. Hollan described "the outcomes" of a recent meeting on physician compensation and included the following item: "For the list of doctors on salary, some of the variances to productivity seem large[.] [D]o we have current fair market value on the ones with a variance of over $50K[?]" In other words, Mr. Hollon recognized that the Signature Defendants were continuing to pay certain physicians far more than their personal productivity justified.

121.    Although the Signature Defendants did not share the details of the most recent SullivanCotter analysis with Relator, comparison of the Signature Defendants' compensation of family practice and internal medicine physicians to national norms in 2020 bears out the concern Mr. Hollon acknowledged in his e-mail on December 3, 2020.

122.    In 2020, at least 11 of SMG's family practice and internal medicine physicians received clinical compensation (*i.e.*, compensation not including benefits or administrative stipends) that was above the 90th percentile of compensation for physicians in the same specialties nationwide according to MGMA data. The Signature Defendants' clinical compensation of all but one or two of those 11 physicians also exceeded SullivanCotter's FMV thresholds for clinical compensation per wRVU and ratio of clinical compensation to collections.

123.    Since Mr. Hollon's e-mail on December 3, 2020, the Signature Defendants have taken no steps to conform their compensation of family practice and internal medicine physicians to national FMV standards.

C.    **The Signature Defendants Also Paid Excessive Administrative Compensation to Certain Physicians Who Conducted High-Cost Procedures at Defendants' Facilities.**

124.    The Signature Defendants paid administrative stipends and other compensation to SMG physicians who served as chief of a specialty group or agreed to assume other administrative responsibilities. SullivanCotter warned the Signature Defendants that, in accordance HHS-OIG's 2005 guidance and the requirement of the Stark Law *bona fide* employment relationships exception that all compensation be for "identifiable services," the Signature Defendants should require recipients of administrative compensation to document time spent on administrative work in exchange for the compensation. Nonetheless, the Signature Defendants never imposed such a documentation requirement on physicians who received administrative stipends, and these physicians did not create or maintain records of time spent on administrative work in exchange for their stipends.

125.    The Signature Defendants provided particularly large, above-FMV stipends to physicians who performed high-value procedures at the Signature Defendants' facilities. Examples of such above-FMV stipends include the following:

        a.    In 2017, HMFP, which leased Richard Mulroy, an orthopedic surgeon, to SMG, agreed to pay Dr. Mulroy, an orthopedic surgeon, $210,000 per year to serve as "Chief of Orthopedic Surgery" for SHC, plus an additional $20,000 per year to conduct "ongoing supervision of Physician's Assistant staff," but neither HMFP nor the Signature Defendants required

Dr. Mulroy to document any time he spent performing services in exchange for this compensation. As discussed further below, the Signature Defendants reimbursed HMFP for a substantial portion of Dr. Mulroy's compensation.

b.  In March 2021, HMFP, which leased Rolf Freter, an oncologist, to SMG, agreed to pay Dr. Freter $155,000 per year to serve as "Chief of Human Oncology" at Brockton Hospital. The contract with Dr. Freter provided that "[v]arious goals and targets to be achieved within this administrative function will be mutually agreed between the parties," but neither HMFP nor the Signature Defendants required Dr. Freter to document any time he spent performing services in exchange for this compensation. Prior to March 2021, HMFP paid Dr. Freter $100,000 per year to serve as Chief of Human Oncology at Brockton Hospital. As discussed further below, the Signature Defendants reimbursed HMFP for a substantial portion of this amount.

c.  In January 2021, SMG agreed to pay James Roan, an obstetrician, $110,000 per year to serve as "Chief of Obstetrics and Gynecology" for SHC and its affiliates, but the Signature Defendants did not require Dr. Roan to document any time he spent performing services in exchange for this compensation.

126.  Separately, in 2014, SMG agreed to pay Deborah Abeles, a bariatric surgeon, up to $25,000 per year as a "Chief Stipend" under the following conditions:

Employee must meet fiscal year growth targets defined below broken out by Medical Weight Loss and Surgical Weight Loss.

**Medical Weight Loss** – if goal is met Employee receives Ten Thousand Dollars ($10,000) – otherwise on sliding scale according to the following:
0-40 new patients entering program - $4,000
41-80 new patients entering program - $8,000
Over 81 new patients goal met - $10,000

**Surgical Weight Loss** – if goal is met Employee receives Fifteen Thousand Dollars ($15,000) – otherwise on sliding scale according to the following Primary Bariatric cases:
0-82 cases in FY - $5,000
83-85 cases in FY - $10,000
Over 85 cases in FY - $15,000

While the additional compensation for Dr. Abeles was not nearly as substantial as the administrative compensation the Signature Defendants provided, directly or indirectly, to Drs. Mulroy, Freter, and Roan, the Signature Defendants explicitly conditioned Dr. Abeles's additional compensation on her generating additional procedures for their facilities.

127.    Further, during the period from October 1, 2014, through March 31, 2020, the Signature Defendants paid Paul Pettinato, an internal medicine physician, additional annual compensation as follows:

| Effective Dates | Stipend |
|---|---|
| 10/1/14 - 2/28/17 | $100,000 |
| 3/1/17 – 11/30/18 | $50,000 |
| 12/1/18 – 3/31/20 | $100,000 |

According to the Signature Defendants' contracts with Dr. Pettinato, this additional compensation was for the performance of "administrative duties," such as "[r]epresent providers on Information Technology Committee" and "[h]elp guide SMG in the strategic decision

discussion [*sic*] making process." The Signature Defendants did not require Dr. Pettinato to document time he spent performing services in exchange for this compensation.

128.    Beyond these direct cash stipends, the Signature Defendants also paid several of the same physicians enhanced administrative stipends by "grossing up" the wRVUs that were used to calculate their productivity compensation. Specifically, the Signature Defendants multiplied the number of clinical wRVUs personally performed by the physician by a multiplier (mathematically calculated as, *e.g.*, "1/.8" or 1/.7"). If these additional wRVUs pushed the physician's annual total into a higher tier, then the Signature Defendants paid the physician a premium on all wRVUs for the year.

129.    Thus, for example, in 2020, the Signature Defendants paid Dr. Alexander Georgakis an annual administrative stipend of $125,000 to serve as the: (1) Chief of Medical Specialties; (2) Chief of Cardiology; and (3) Director of the Anti-Coagulation Management Service.

130.    The year-end calculation of Dr. Georgakis's clinical compensation notes that his clinical work generated 10,699.99 wRVUs. That would have qualified him for Tier 7, and thus a conversion factor of $60 per wRVU.

131.    The Signature Defendants, however, "grossed up" that figure, dividing it by .8 to generate a total of 13,374.99 wRVUs, and qualifying him for Tier 8's $61 per wRVU conversion factor.

132.    As a result, Dr. Georgakis got an additional $10,699.99 ($1 per wRVU for each of his 10,699.99 wRVUs), above and beyond the $125,000 administrative stipend, as compensation for his administrative duties.

133.    Even more, these extra payments would evade fair market value review (at least as part of an administrative stipend review) because they would be masked as payments for purported clinical effort.

**D.    The Signature Defendants, BIDMC, and HMFP Engaged in a Kickbacks for Referrals Scheme.**

134.    Since at least 2014, BIDMC, either directly or through its subsidiary, APG, has paid the Signature Defendants substantial kickbacks in exchange for referrals from the Signature Defendants to BIDMC and HMFP for patients requiring complex, tertiary hospital care. The defendants set up this kickback arrangement in a pair of interrelated agreements they entered into in 2013 and 2014.

135.    First, on May 31, 2013, BIDMC, HMFP, and SHC entered into a multi-faceted Clinical Affiliation Agreement governing their relationship. This agreement provided, among other things, that SHC would "be co-branded as an affiliate of BIDMC," that BIDMC would pay to market this "co-branding initiative," that, subject to a future agreement, HMFP oncologists and orthopedists would work at SHC facilities, and that, subject to limited exceptions required by law, "SHC shall designate BIDMC and HMFP as the preferred provider of tertiary/quaternary services to SHC's patients and as SHC's exclusive tertiary/quaternary 'clinical affiliate' for all services except for (x) pediatric and neonatal programs and services and (y) services and programs provided directly by SHC." The Clinical Affiliation Agreement further provided that "SHC shall designate BIDMC as the preferred provider for primary stroke and trauma services when treatment of patients with acute stroke or trauma, respectively, requires transfer from [Brockton Hospital] to a tertiary hospital." Pursuant to a May 2020 amendment to the Clinical Affiliation Agreement, BIDMC agreed to pay up to $75,000 per year "for clinical marketing initiatives mutually agreed to by BIDMC and SHC."

38

136.    Second, effective January 22, 2014, SMG and BIDMC, through its subsidiary, APG, entered into a Leased Physicians Agreement pursuant to which BIDMC agreed to lease certain APG physicians, including several orthopedists and oncologist Rolf Freter, to SMG at less than BIDMC's cost of paying those physicians. Specifically, while the Leased Physicians Agreement obligated SMG to reimburse BIDMC for the cost of the leased physicians' salary and benefits, plus $27,500 per full time equivalent leased physician, it further provided that, if SMG lost money on the leased physicians (*i.e.*, if the cost of paying for the physicians and their associated overhead exceeded the revenue from their personally performed services), then SMG could deduct 20 percent of that loss amount from the lease fee it paid to BIDMC. While the Leased Physicians Agreement conversely provided that SMG would pay BIDMC extra if it made a profit on the leased physicians, SMG consistently lost money on the leased physicians (in part because of the excessive compensation some of them received) and thus SMG consistently paid BIDMC lease fees that were lower than BIDMC's cost of providing the physicians to SMG. In other words, BIDMC, through APG, effectively subsidized the cost of the leased physicians for SMG. Pursuant to an amendment to the Leased Physicians Agreement dated October 1, 2017, the parties agreed that this subsidy would not exceed $750,000 per year. Pursuant to an amendment dated May 28, 2020, the subsidy cap increased to $875,000 per year.

137.    Taken together, these two agreements created the following exchange: on the one hand, BIDMC and its affiliates paid SHC and its affiliates hundreds of thousands of dollars each year to market SHC and to subsidize the cost of physicians SMG leased from BIDMC; on the other hand, SHC and its affiliates referred almost all of their complex cases requiring tertiary care to BIDMC and HMFP.

138.    The Signature Defendants effectuated their end of the bargain with a referral

policy that included the following provision:

> For patients requiring community level specialty care (that can be provided by
> SMG specialists) . . . and in the specialties of Hematology/Oncology, Orthopedics
> including Spine, Cardiology, Endocrinology, Podiatry, Weight loss/Bariatric,
> Rheumatology, Dermatological Surgery and General/Vascular surgery, referrals
> will follow the following algorithm:
> > Patient must have seen the PCP within the last year
> > Patient must have seen the SMG specialist first.
> . . . If the patient meets both conditions and still requests an external specialist the
> patient will be given a referral to Beth Israel Deaconess Medical Center (BIDMC)
> provided the service is available.

## VI.    CAUSES OF ACTION

### COUNT I
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(A)

139.    Relator re-alleges and incorporates by reference all paragraphs of this complaint

set out above as if fully set forth herein.

140.    As a result of their violations of the Stark Law and the AKS, all of the defendants

presented and caused to be presented materially false and fraudulent claims for payment or

approval to the United States.

141.    All of the defendants presented or caused to be presented such claims with actual

knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not

they were false.

142.    The United States sustained damages because of the defendants' wrongful

conduct.

### COUNT II
### Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(B)

143.    Relator re-alleges and incorporates by reference all paragraphs of this complaint

set out above as if fully set forth herein.

144.    All of the defendants made, used, and caused to be made or used false records or statements – *i.e.*, the false certifications and representations of compliance with the law, including the AKS and the Stark Law, that all of the defendants and their affiliates made and caused to be made when submitting claims, enrollment agreements, and annual cost reports – to get false or fraudulent claims paid and approved by the United States.

145.    All of the defendants made their false certifications and representations for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of the defendants' statements and actions.

146.    The false certifications and representations that the defendants made and/or caused to be made were material to the United States' payment of the false claims.

147.    All of the defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

148.    The United States sustained damages because of the defendants' wrongful conduct.

### COUNT III
### Massachusetts False Claims Act, Mass. Gen. Laws c. 12, § 5B(a)(1)

149.    Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

150.    As a result of their violations of the Stark Law and the AKS, all of the defendants presented and caused to be presented materially false and fraudulent claims for payment or approval to MassHealth.

41

151.    All of the defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

152.    The Commonwealth of Massachusetts sustained damages because of the defendants' wrongful conduct.

### COUNT IV
### Massachusetts False Claims Act, Mass. Gen. Laws c. 12, § 5B(a)(2)

153.    Relator re-alleges and incorporates by reference all paragraphs of this complaint set out above as if fully set forth herein.

154.    All of the defendants made, used, and caused to be made or used false records or statements – *i.e.*, the false certifications by BIDMC and Brockton Hospital that they would "comply with all laws, rules, and regulations governing MassHealth" – to get false or fraudulent claims paid and approved by MassHealth.

155.    All of the defendants made these false certifications for the purpose of getting false or fraudulent claims paid by the Commonwealth of Massachusetts, and payment of the false or fraudulent claims by the Commonwealth of Massachusetts was a reasonable and foreseeable consequence of the defendants' actions.

156.    The false certifications and representations that all of the defendants made and/or caused to be made were material to the Commonwealth of Massachusetts' payment of the false claims.

157.    All of the defendants made or caused to be made such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

42

158.    The Commonwealth of Massachusetts sustained damages because of the defendants' wrongful conduct.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Relator demands and prays for the following relief:

1.    On Counts I and II, that judgment be entered in favor of the United States for the amount of the United States' damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

2.    On Counts III and IV, that judgment be entered in favor of the Commonwealth of Massachusetts for the amount of the Commonwealth's damages, trebled as required by law, and such civil penalties as are required by law, together with all such further relief as may be just and proper;

3.    An award to Relator of a percentage of the proceeds of the action in accordance with 31 U.S.C. § 3730(d);

4.    An award to Relator of his costs and reasonable attorney's fees for prosecuting this action; and

5.    All other relief as may be required or authorized by law and in the interests of justice.

## VIII.  DEMAND FOR JURY TRIAL

Relator hereby demands a trial by jury.

Dated: February 15, 2022

Respectfully submitted,

KEVIN MURPHY

By his attorneys

/s/ *Gregg Shapiro*
Gregg Shapiro (BBO No. 642069)
Jeffrey Newman (BBO No. 370450)
Newman and Shapiro
1 Story Terrace
Marblehead, MA 01945
Tel: 617-582-3875
gshapiro@newmanshapiro.com

Timothy McCormack (BBO No. 650847)
Van Meer & Belanger PA
215 Commercial St, 4th Floor
Portland ME 04101
Tel: 207-871-6500
tmccormack@vblawfirm.com